1  DOUGLAS FUCHS, SBN 196371
   dfuchs@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
3  Los Angeles, CA 90071-3197
   Telephone:  213.229.7000
4  Facsimile:   213.229.7520

5  Attorney for Plaintiff EPICGENETICS LLC, a
   California limited liability company

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10  EPICGENETICS LLC, a California        CASE NO. 2:22-cv-2741
    limited liability company,
11                                        **COMPLAINT**
                  Plaintiff,
12
         v.
13
    XAVIER BECERRA, in his official
14  capacity as Secretary of the United
    States Department of Health & Human
15  Services; UNITED STATES
    DEPARTMENT OF HEALTH &
16  HUMAN SERVICES; CHIQUITA
    BROOKS-LASURE, in her official
17  capacity as Administrator for the
    Centers for Medicare and Medicaid
18  Services; QLARANT QUALITY
    SOLUTIONS, INC.; QLARANT
19  INTEGRITY SOLUTIONS, LLC AND
    QLARANT, INC.,
20
                  Defendants.
21

22         EpicGenetics LLC, a California limited liability company, complains of Xavier

23  Becerra, Secretary of the United States Department of Health & Human Services

24  ("HHS"); HHS; Chiquita Brooks-LaSure, Administrator for the Centers for Medicare

25  and Medicaid Services ("CMS"); Qlarant Quality Solutions, Inc.; Qlarant Integrity

26  Solutions, LLC, and Qlarant, Inc. (collectively, the "Defendants") as follows:

27

28

Gibson, Dunn &
Crutcher LLP

## INTRODUCTION

1.    This is a civil action to prevent Defendants from continuing their: 1) violations of the regulations governing the Medicare payment suspension process, 2) refusal to provide the due process required by the Fifth Amendment to the United States Constitution, 3) unlawful suspension of Medicare payments to Plaintiff EpicGenetics LLC, and 4) for a Writ of Mandamus to order Defendants' prompt compliance with their obligations under the Due Process Clause and/or as set forth in 42 C.F.R. §§ 405.371 (2019), 372 (2011), and 375 (2011). In light of the ongoing and irreparable harm that Defendants' conduct is causing, EpicGenetics will soon file a motion for a preliminary injunction.

2.    Plaintiff EpicGenetics is a BSL-2 clinical laboratory solely dedicated to the accurate diagnosis of fibromyalgia and the development of related treatment options. It is a CLIA- and CAP-certified clinical medical laboratory operating in Los Angeles, California.[1] EpicGenetics is a small company that, until reductions in force necessitated by Defendants' conduct in this case, employed only 20 employees.

3.    EpicGenetics' laboratory was founded in 2013 by Bruce Gillis, M.D., M.P.H. Dr. Gillis has spent nearly two decades as a tireless advocate for fibromyalgia patients since he and a group of researchers at the University of Illinois, College of Medicine at Chicago discovered a new way to detect and diagnose fibromyalgia.

4.    The method these scientists discovered, now known as the FM/a Test, is the sole diagnostic service provided by EpicGenetics. Dr. Gillis also conducts and supports fibromyalgia research through EpicGenetics and currently has research collaborations with medical centers at the Mayo Clinic, Johns Hopkins, the Stanford

---

[1]  The Clinical Laboratory Improvement Amendments ("CLIA") created certain federal standards for certifying laboratories that test specimens to diagnose, treat, or prevent disease. The Medicare program requires diagnostic laboratories like EpicGenetics to be CLIA-certified. The College of American Pathology ("CAP") administers a laboratory accreditation program involving peer inspection of pathology laboratory facilities for assessment against applicable standards.

Gibson, Dunn & Crutcher LLP

Medical Center, the University of Illinois College of Medicine, and an affiliate of the University of Virginia.

5.     On December 16, 2021, Defendant Qlarant Integrity Solutions, LLC ("Qlarant") issued a Notice of Suspension of Medicare Payments to EpicGenetics (the "Notice"), indefinitely suspending reimbursement for all services provided by EpicGenetics to Medicare beneficiaries. Ex. A (Qlarant Notice of Suspension). No prior notice was provided, and EpicGenetics had no prior contact with CMS or any other governmental agency that would reveal the basis for the suspension. In its eight years of operation, EpicGenetics' Medicare reimbursement requests had never been challenged or even questioned by Defendants.

6.     In the Notice, Defendants claimed that the suspension was "based on credible allegations of fraud" but did not explain, in any level of detail, what those allegations were, what "indicia of reliability" under Defendants' standards applied to assess the "credibility" of the allegations, or how the allegations demonstrate those indicia. Ex. A, at 40.

7.     Instead, the Notice alleged in a single cursory sentence that the services billed in just five patient claims were "medically unnecessary," but did not provide information that would permit EpicGenetics to understand and have a full opportunity to rebut that allegation. *Id.*[2] Moreover, finding a service is "medically unnecessary" at most provides a basis for a finding of overpayment, not a finding of *fraud*, the credible allegation of which is necessary to continue the suspension under the governing regulations.

8.     None of the several vague reasons purporting to explain why these services were medically unnecessary actually identify or correspond with a claim of fraud. Nor do the vast majority identify or even align with any requirements for Medicare payment eligibility. The Notice also contains no allegation or explanation

---

[2] For comparison, EpicGenetics performs and seeks reimbursement from insurance payors, including Medicare, for an average of over 1,500 tests per year.

Gibson, Dunn &
Crutcher LLP

1    of how EpicGenetics may satisfy the other well-established elements of a fraud

2    claim, such as the intent to defraud, materiality, or causation.

3        9.    To date, EpicGenetics remains completely unaware of the actual

4    allegations of fraud that CMS claims justified the suspension. This is critical because

5    the credible allegations of fraud were required for Defendants to suspend Medicare

6    payments without any prior notice under 42 C.F.R. § 405.372(a)(4) (2011) and are

7    required for Defendants to continue the suspension without providing additional

8    procedural protections that would otherwise be required by Medicare regulations.[3]

9        10.   Notwithstanding these challenges, on January 27, 2022, EpicGenetics

10   provided Defendants with a letter rebutting what it could glean from the Notice.

11   Ex. B (EpicGenetics Rebuttal Letter). But the lack of information in the Notice

12   forced EpicGenetics to guess at the allegations, making it impossible for it to take

13   advantage of the rebuttal opportunity to which it was entitled under federal law. *See*

14   42 C.F.R. § 405.372(b)(2) (2011) (after notice of suspension, provider must be given

15   an opportunity "to submit a rebuttal statement as to why the suspension should be

16   removed"). In its rebuttal letter, EpicGenetics requested an opportunity to discuss the

17   suspension with Defendants so that it could better understand and respond to the

18   allegations, but Defendants refused.

19       11.   Pursuant to 42 C.F.R. § 405.375(a)–(b) (2011), Defendants were required,

20   "within 15 days, from the date the [rebuttal] statement [wa]s received, [to] consider

21   the statement" and "send written notice of [its] determination" to lift or continue the

22   suspension.

23       12.   On numerous occasions, EpicGenetics contacted Defendants requesting

24   that they comply with their obligation to consider and respond to the rebuttal

---

25

26   [3]  Federal regulations permit a "no-notice" suspension in only two other scenarios:
     (1) where the suspended provider has failed to provide necessary information to
27   calculate an overpayment; and (2) where there is a fear that alerting the provider to
     CMS's inquiry would cause the investigated funds to be spoliated. *See* 42 C.F.R.
28   § 405.372(a)(2)-(3) (2011). Neither of those scenarios is present here, and
     Defendants did not cite those scenarios as a basis for the suspension.

submission. For over two months, Defendants refused to abide by this requirement, evidencing a complete disregard for the applicable law and the hardships imposed by the suspension.

13.   In addition, 42 C.F.R. § 405.375(a) (2011) requires that Defendants consider the rebuttal statement "together with any other material bearing upon the case, and determine whether the facts justify the suspension." This plainly requires that Defendants consider all available information, not just the rebuttal statement. EpicGenetics has asked repeatedly for additional information or clarification to ensure it was addressing Defendants' concerns, and it has offered repeatedly to then provide additional information corresponding to such concerns, but Defendants have continuously refused to provide this information. Defendants have also explicitly refused to engage in any dialogue to permit more effective communication among the parties about CMS's concerns and EpicGenetics' responses thereto.

14.   On April 20, 2022—shortly after Plaintiff informed Defendants that their conduct left Plaintiff no option but to seek relief from a federal court—Defendants attempted to block judicial relief by finally delivering what purports to be a written notice of their determination to continue the suspension as required by 42 C.F.R. § 405.375 (2011). Ex. C. (April 20, 2022, Response Letter). Pursuant to 42 C.F.R. § 405.375(b) (2011), this "written notice of the determination" was required to contain "specific findings on the conditions upon which the suspension is initiated, continued, or removed."

15.   The response is still woefully inadequate and fails to explain the basis for Defendants' fraud allegations. It contains no "specific findings" as required by the governing regulations. Nothing in Defendants' written response identifies any new or different information than that provided in the original Notice of Suspension and therefore it shares all of the same deficiencies—the response letter copies and pastes, verbatim, the "reasons" listed in the Notice and does not elaborate on those reasons or name the specific findings supporting the continued suspension. Importantly,

Gibson, Dunn &
Crutcher LLP

nothing in Defendants' written response identifies the required allegation of *fraud*. Defendants' failures are especially egregious given that EpicGenetics had expressly and repeatedly raised concerns that it did not have enough information to understand and respond to the supposed allegations of fraud, or the "credibility" of those allegations, that provide the stated basis for the no-notice suspension.

16.   EpicGenetics has a constitutionally protected interest in payments for services rendered and a reasonable expectation of continued payment from the Medicare program. There is a high risk that EpicGenetics will be wrongfully deprived of these interests because it has not been afforded the opportunity to provide Defendants with information that could assuage the unidentified allegations, and because the ongoing suspension will likely put EpicGenetics out of business before it is ever able to begin CMS's administrative appeals process. Moreover, even if EpicGenetics was able to survive until it could begin an administrative appeals process, that process would not afford it an opportunity to challenge whether the Notice itself satisfies the applicable procedural and regulatory requirements.

17.   Defendants' conduct—which threatens to force EpicGenetics out of business based on unspecified allegations—fails to comply with the government's own regulations, let alone the minimum requirements of the Due Process Clause and the Administrative Procedure Act. In particular, Defendants have deprived EpicGenetics of Medicare payments and caused significant financial harm without adequate notice of the basis for the allegations, an opportunity to rebut those allegations, or review of the suspension by a neutral decisionmaker.

18.   EpicGenetics strongly disputes any allegation of fraud and is confident that it has complied with requirements for Medicare reimbursement. But this case does not require the Court to rule on the merits of Defendants' allegations or interfere with Defendants' investigation of those allegations. Rather, this lawsuit simply asks the Court to hold Defendants to the basic requirements of due process and administrative law. The Court should enter injunctive relief that lifts Defendants'

unlawful suspension of Medicare payments to EpicGenetics until Defendants complete their investigation of the purported allegations or, in the alternative and at minimum, comply with their own regulations and provide EpicGenetics with basic due process. In particular, the Court should require Defendants to comply with their non-discretionary duties to: (1) provide enough information to allow EpicGenetics a meaningful opportunity to rebut the allegations that led to the suspension; (2) respond to EpicGenetics' rebuttal within 15 days of receipt; and (3) provide for a prompt hearing before a neutral adjudicator.

## PARTIES

19.    Plaintiff EpicGenetics LLC is a California limited liability company based in Los Angeles, California.

20.    Defendant Xavier Becerra is named solely in his official capacity, as the Secretary of HHS, the federal department which contains CMS, the agency within HHS responsible for administering Medicare and Medicaid programs.

21.   Defendant HHS is the federal agency responsible for administering the nation's healthcare program for the aged and disabled, known as Medicare.

22.   Defendant Chiquita Brooks-LaSure is named solely in her official capacity as the Administrator of CMS, the agency responsible for administering Medicare and Medicaid programs.

23.   Defendants Qlarant Quality Solutions, Inc.; Qlarant Integrity Solutions, LLC, and Qlarant, Inc. are "integrity contractors" for Medicare. Defendants have been assigned the role of investigating alleged Medicare overpayments. They do business in the Central District of California.

## JURISDICTION & VENUE

24.   The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 under the entirely collateral Constitutional claim exception to the exhaustion requirement established by *Matthews v. Eldridge*, 424 U.S. 319 (1976).

25.   The Court also has jurisdiction pursuant to 42 U.S.C. §§ 405(g), 1395ii, and 1395ff(b), and under *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1 (2000).

26.   If this Court does not issue injunctive relief, EpicGenetics will have no review at all before irreparable harm takes place, after which the theoretically available administrative remedies will be too late and of no value.

27.   Accordingly, this matter is ripe for judicial review.

28.   In addition, the Court has mandamus jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Thus, the Court has jurisdiction to hear EpicGenetics' claim that Defendants have failed to abide by their clear and nondiscretionary duties, which would otherwise evade review.

29.   Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) and 5 U.S.C. § 703 because EpicGenetics is located in the Central District of California, in which a substantial portion of the relevant conduct occurred, and brings suit against a government agency and officials in their official capacity.

30.   The Court has personal jurisdiction over Defendants Qlarant Quality Solutions, Inc., Qlarant Integrity Solutions, LLC, and Qlarant, Inc. because they serve as the integrity contractor responsible for review of Medicare payments to providers in the state of California, including Plaintiff EpicGenetics, and issued the Notice to EpicGenetics at its place of business in Los Angeles, California.

Gibson, Dunn &
Crutcher LLP

## FACTS AND PROCEDURAL HISTORY

### EpicGenetics and the FM/a Test

31.   Fibromyalgia is a painful, chronic health disorder that causes pain and tenderness throughout the body.[4]

32.   EpicGenetics is a BSL-2 laboratory solely dedicated to the accurate diagnosis of fibromyalgia and the development of related treatment solutions. It is a CLIA- and CAP-certified clinical medical laboratory that, until recently, employed approximately 20 individuals.

33.   EpicGenetics' laboratory was founded in 2013 by Bruce Gillis, M.D., M.P.H. Dr. Gillis has spent nearly two decades as a tireless advocate for fibromyalgia patients since he and a group of researchers at the University of Illinois, College of Medicine in Chicago discovered the first objective and scientific way to detect and diagnose fibromyalgia.

34.   The vast majority of the EpicGenetics' patients have spent years suffering from undiagnosed pain and attempting a wide variety of failed tests and treatments because their physicians suspected other conditions due to a lack of a confirmed fibromyalgia diagnosis. These physicians often order numerous tests that simply "rule out" conditions other than fibromyalgia. According to the Fibromyalgia Clinic at the Mayo Clinic in Rochester, Minnesota, the average fibromyalgia patient whom they are asked to evaluate and diagnose has already spent 7 years and thousands of dollars in search of an objective diagnosis.

35.   This process of elimination to achieve a diagnosis, also known as a "rule-out test" process, attempts to narrow the universe of possible diagnoses by determining what a patient does *not* have, but still leaves the physician to struggle to accurately determine an alternative diagnosis such as fibromyalgia.

---

[4]   *See, e.g.*, Daniel Wallace et al., *Cytokine and Chemokine Profiles in Fibromyalgia, Rheumatoid Arthritis and Systemic Lupus Erythematosus: A Potentially Useful Tool in Differential Diagnosis*, 35 RHEUMATOL. INT. 991, 991 (Nov. 7, 2014).

Gibson, Dunn & Crutcher LLP

36.  A 2012 study conducted by several researchers with the Department of Pathology at the University of Illinois College of Medicine radically changed the medical community's approach to fibromyalgia diagnosis. The peer-reviewed article on that study demonstrated that chemokine and cytokine levels in patient samples revealed "unique immunologic patterns in fibromyalgia" by which doctors could define and diagnose the disorder. Ex. B, at 62 (Attachment 1 to Rebuttal Letter). This research was the first ever "rule-in" "diagnostic methodology in [fibromyalgia]" and formed the basis of EpicGenetics' FM/a Test. *Id.* at 71.

37.  The FM/a Test is, by necessity, a highly complex, multi-biomarker-based test system evaluating the immune system's production patterns of chemokine and cytokine. EpicGenetics vets potential candidates based on strict criteria. Candidates complete a symptom questionnaire and are required to provide information regarding the longevity of these symptoms, along with the patient's medical history.

38.  For EpicGenetics' patients, obtaining an accurate and objective diagnosis of fibromyalgia is crucial to managing their symptoms, safety, and mental health, with accompanying benefits to the health care system by avoiding wasteful utilization of testing and medication for speculative, incorrect diagnoses. The failed diagnoses that are made following traditional rule-out tests pose a significant threat to patient safety. Over 40% of patients with fibromyalgia rely on narcotics, opiates, or the use of "Black Box" warning-labeled drugs to treat wrongly identified, speculative diagnoses as causes of pain. The cycle of testing and consumption of serious medications without improvement, and the feelings of hopelessness that the latter can generate, takes a huge toll on a patient's mental health as well: a June 2019 study found that "the overall suicide ideation prevalence was 29.57%" in patients with fibromyalgia, which was much "higher with respect to the general population."[5]

---

[5]  *See* Mohammad Adawi et al., *Suicidal Behavior in Fibromyalgia Patients: Rates and Determinants of Suicide Ideation, Risk, Suicide, and Suicidal Attempts-A Systematic Review of the Literature and Meta-Analysis of Over 390,000 Fibromyalgia Patients*, 12 FRONTIERS IN PSYCHIATRY, Art. 629417 (2019).

Gibson, Dunn & Crutcher LLP

39.   EpicGenetics' FM/a Test uniquely provides this objective and accurate diagnosis, which in turn allows government health programs and private insurance companies to avoid paying for unnecessary and potentially detrimental rule-out tests and treatments for fibromyalgia sufferers.

40.   The accuracy and value of the FM/a Test have been repeatedly affirmed by the medical and scientific community. A 2014 study of the test, published in Rheumatology International, concluded that it "demonstrate[s] statistically significant differences in scores comparing patients with [fibromyalgia], healthy controls and autoimmune disease." Ex. B, at 74 (Attachment 2 to Rebuttal Letter). This breakthrough discovery earned the researchers who discovered the diagnostic blood test, including Dr. Gillis, an award for "Outstanding Research in Clinical and Diagnostic Immunology" from the American Association for Clinical Chemistry. Most recently, in 2021, the Mayo Clinic conducted a study reviewing the efficacy of the FM/a Test. The study concluded that "[t]he FM/a® test (a chemokine-cytokine multiplex assay) is a novel and useful tool for the diagnosis of FM" with 90% accuracy. Ex. D, at 109 (Mayo Clinic FM/a Test Manuscript). More specifically, the Mayo Clinic found that the:

> [T]est could be very useful in 'upstream' general clinical practices . . . . The adoption of the FM/a® test in such settings would greatly help to efficiently differentiate patients that are more likely to have FM from those that do not, streamlining the work-up and significantly helping to lessen overall burden (time, cost, appointments) for both patients and healthcare professionals.

Id. at 104–05.

41.   Since opening in 2013, EpicGenetics has performed over 13,400 FM/a Tests for patients nationwide. Prior to the December 16, 2021 suspension of Medicare payments, EpicGenetics received approximately 40% of its annual revenue from Medicare services. Until the Notice of Suspension, Defendants had consistently

Gibson, Dunn & Crutcher LLP

11

paid Medicare reimbursements to EpicGenetics without issue for the entirety of the Company's existence.

42.   Because Defendants have consistently paid Medicare reimbursements to EpicGenetics for several years, EpicGenetics reasonably relied on this ongoing stream of revenue in planning its business and making its services available to doctors and patients.

43.   EpicGenetics is a subsidiary of, and reports its annual income through, a parent company, Bruce S. Gillis, MD MPH, Inc. (the "Medical Corporation"). The Medical Corporation pays certain of EpicGenetics' expenses directly on the latter company's behalf, and EpicGenetics pays the remaining expenses on its own behalf.

44.   To date, EpicGenetics has generally not been profitable following its founding in 2013. To support EpicGenetics' operations, the Medical Corporation previously loaned funds to EpicGenetics without interest to keep the business operating. When EpicGenetics receives payments from Medicare or other payors, that revenue is used to pay EpicGenetics' operating expenses. Any remaining funds are used to pay down EpicGenetics' loan from the Medical Corporation. Any modest net income realized by EpicGenetics pales in comparison to its debt, which has yet to be repaid in full. EpicGenetics' finances, including its financial performance and reliance on loans from the Medical Corporation to operate, demonstrate that its purpose is not to enrich the Medical Corporation or any individuals; the Company is truly dedicated to helping the critically underserved fibromyalgia patient community and further developing patient care in this area of medicine.

45.   Since the December 16, 2021 suspension of Medicare payments, EpicGenetics' tests per month have decreased by over 90%. EpicGenetics has reduced its staffing by 35%, including through employee lay-offs and reducing employee hours with corresponding reductions in salaries. Because of the highly complex, skilled clinical laboratory work required to implement the FM/a Test, EpicGenetics faces a critical threat to its viability because these employees are

1  underemployed, especially relative to their qualifications. Should these employees

2  leave EpicGenetics for other fully-salaried positions, it would be extremely difficult

3  and costly to replace them, and would cause further lost revenue and other harm to

4  the Company.

5  **Medicare Reimbursement and Suspension Process**

6  46.   The Medicare program was enacted in 1965 under Title XVII of the

7  Social Security Act, also known as the Medicare Act. Social Security Amendments

8  of 1965, Pub. L. 89-97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C.

9  §§ 1395-1396v). The Medicare program's primary objective is to ensure that its

10  beneficiaries have access to health care services. *Id.* at 286. EpicGenetics qualifies as

11  a provider of diagnostic laboratory services under the Medicare Act.

12  47.   CMS reimburses Medicare providers like EpicGenetics with payments for

13  covered claims. The Medicare Act provides for coverage of services that are

14  "reasonable and necessary for the diagnosis or treatment of illness or injury or to

15  improve the functioning of a malformed body member." 42 U.S.C. § 1395(y).

16  48.   CMS contracts with Administrative Contractors to process and provide

17  payment on valid claims, and with Integrity Contractors to identify suspected fraud,

18  waste, or abuse of Medicare funds. These contractors are appointed to review

19  Medicare payments to providers in specific designated geographical areas. The

20  Integrity Contractor covering Medicare payment review for EpicGenetics'

21  geographical area is Qlarant.

22  49.   CMS and, by extension, the Medicare contractors with whom it engages,

23  have the authority to suspend payments to health care providers in the interest of

24  protecting the Medicare Trust Fund. 42 C.F.R. § 405.371 (2019). But as a general

25  matter, the Medicare program is designed to first pay providers for claims and then

26  for the Government to later recoup money that may have been paid in error. As such,

27  CMS and its various contractors typically identify potentially problematic payments

28

1  through a post-payment review process conducted by the Integrity Contractor

2  assigned to a given geographical area.

3      50.   Upon information and belief, Integrity Contractors, and Qlarant in

4  particular, are paid at least in part based on the amount of Medicare reimbursements

5  they recover from providers from these alleged improper payments. Thus, Integrity

6  Contractors have a direct financial interest in overturning original payment decisions.

7      51.   Typically, when CMS or a Medicare contractor determines that a

8  suspension of payments is warranted, the Medicare contractor is required to notify

9  the provider of its intention to suspend payments and the reasons for the suspension,

10  and to give the provider an opportunity to rebut those reasons *before* the suspension

11  can go into effect. 42 C.F.R. § 405.372(a)(1) (2011). This process permits the

12  provider to correct any misunderstandings or misguided allegations regarding

13  erroneous payments *before* it is harmed by the impact to its revenue from the

14  suspension.

15      52.   CMS and its contractors have limited authority, however, to suspend

16  Medicare payments *without* prior notice to providers if the payment involves, *inter*

17  *alia,* "credible allegations of fraud." 42 C.F.R. § 405.372(a)(4) (2011). "Credible

18  allegation[s]" can emanate from any source, including "[f]raud hotline tips verified

19  by further evidence," "[c]laims data mining," and "[p]atterns identified through

20  provider audits, civil false claims cases, and law enforcement investigations."

21  42 C.F.R. § 405.370(a) (2021). "Allegations are considered to be credible when they

22  have indicia of reliability." *Id.*

23      53.   The power to suspend payment without notice is an extraordinary remedy

24  that allows the Government to place a provider in a financial chokehold indefinitely.

25  A suspension issued without prior notice can continue for up to 18 months, and CMS

26  may extend payment suspension even beyond that point if administrative action is

27  being "considered" or the Department of Justice ("DOJ") submits a request.

28  42 C.F.R. § 405.371(b) (2019).

Gibson, Dunn &
Crutcher LLP

54.   To wield this extraordinary power, the Medicare Act's implementing regulations impose certain requirements on CMS and its Medicare contractors. Once a suspension is imposed without prior notice, CMS must give the provider an opportunity to submit a rebuttal statement "as to why the suspension should be removed." 42 C.F.R. § 405.372(b)(2) (2011).

55.   But a provider cannot have an "opportunity" to submit a rebuttal statement unless it knows what it is rebutting. This means that CMS must provide enough information about the basis for the suspension to give the provider a meaningful chance to show that the suspension is unfounded. In particular, CMS must provide a meaningful chance to rebut *both* the government's concern about a potential overpayment by Medicare *and* the reason it chose to suspend payments with no prior notice. Thus, where applicable, CMS must provide enough information about the "credible allegations of fraud" because if those allegations are successfully rebutted, it would remove the legal basis for the no-notice suspension.

56.   If a provider submits a rebuttal statement, "CMS, the intermediary, or carrier must within 15 days, from the date the statement is received, consider the statement . . . together with any other material bearing upon the case, and determine whether the facts justify the suspension." 42 C.F.R. § 405.375(a) (2011).

57.   In adopting these regulations, CMS recognized the weight of this authority to suspend payments without notice and the importance of giving providers a meaningful opportunity to defend themselves through the rebuttal statement process. In the rulemaking, CMS responded to commenters' due process concerns by stating that:

> [P]roviders who have had their payments suspended based on credible allegations of fraud [will have] ample opportunity to submit information to us in the established rebuttal statement process to demonstrate their case for why a suspension is unjustified . . . We reiterate that this authority will be exercised judiciously.

Gibson, Dunn & Crutcher LLP

76 Fed. Reg. 5862, 5930 (Feb. 2, 2011). To have "ample opportunity" to demonstrate that a suspension is "unjustified" inherently requires that the provider be given enough information to understand the initial justification for the no-notice suspension.

58.   At the end of the 15-day period to consider the rebuttal statement and all pertinent information, CMS or its Medicare contractor must "send written notice of [its] determination . . . [with] specific findings on the conditions upon which the suspension is initiated, continued, or removed." 42 C.F.R. § 405.375(b) (2011).

59.   The regulations purport to differentiate between this preliminary determination and an official "initial determination" that is immediately appealable to Medicare Administrative Contractor. 42 C.F.R. § 405.375(c) (2011). Providers are typically unable to challenge such suspensions within HHS until an overpayment determination is made at the conclusion of CMS's investigation—a process which, as noted above, may take 18 months or more—at which time a provider may begin the lengthy administrative appeals process.

60.   Accordingly, the preliminary determination is final agency action with respect to the question whether to suspend payments for the duration of an investigation into alleged overpayments, which can last many months or years.

**Suspension of Medicare Payments to EpicGenetics**

61.   On December 16, 2021, Defendant Qlarant issued a Notice of Suspension of Medicare Payments to EpicGenetics, indefinitely suspending reimbursement for all services provided by EpicGenetics to Medicare beneficiaries. The Notice stated that "[]CMS[] through its Central Office made the decision to suspend your Medicare payments." Ex. A, at 40 (Qlarant Notice of Suspension).

62.   No prior notice was provided, and EpicGenetics has not had any prior contact with CMS or any other governmental agency that would reveal the basis for the suspension. For example, EpicGenetics is unaware of any civil false claims

actions (or any other legal actions) against it and has not been contacted by any law enforcement agency.

63.   Defendants alleged that the Notice was based on "credible allegations of fraud" and included a list of five sample claims. The Notice provided only the following information regarding the basis for the suspension:

> Specifically, the suspension of your Medicare payments is based on, but not limited to, information that you misrepresented services billed to the Medicare program. More particularly, it has been determined that the services billed are medically unnecessary because you are reporting insufficiently accurate diagnoses using a test that is not approved by the FDA or Medicare; improperly using codes; and using panels to indiscriminately screen specimens, regardless of the submitted suspected diagnosis and without being sufficiently linked to any reasonable follow-up care.

Ex. A, at 40 (Qlarant Notice of Suspension).

64.   The Notice provided no information about the allegations of fraud or why they were deemed to be "credible." The lone sentence alleging that EpicGenetics submitted claims for medically unnecessary services makes no reference to actual *fraud*, which requires, among other elements, a culpable state of mind including an intent to deceive a counterparty.

65.   This is critical because the "fraudulent" and "credible" aspects of the allegations are what permit Defendants to suspend Medicare payments without any prior notice under 42 C.F.R. § 405.372(a)(4) (2011).

66.   Moreover, the vast majority of the "reasons" provided in the Notice do not even correspond to requirements for Medicare payment eligibility.

67.   Specifically, the Notice conspicuously does not state what standard of "accuracy" would be sufficient under any scientific methodology, and no threshold level of "accuracy" is required by Medicare outside of CLIA certification, which

Gibson, Dunn &
Crutcher LLP

evaluates the adequacy of a lab's processes that bear on testing. Regardless, numerous studies, including the recent study by the Mayo Clinic, recognize that EpicGenetics' FM/a Test diagnoses fibromyalgia with 90% accuracy. Without an identified standard of "accuracy," EpicGenetics has no way of knowing how to directly rebut CMS's concerns about the accuracy of diagnoses produced by the FM/a Test, let alone CMS's unexplained belief that this unidentified standard (if a standard is even being used) supports an allegation of intentional fraud.

68.    The Notice also does not identify which "codes" may have been "improperly used." This is significant because the health care reimbursement apparatus nationwide is heavily reliant on numerous different types of codes to communicate information in insurance claims—such as service codes, diagnosis codes, and procedure codes. The Notice does not allow EpicGenetics to identify which of the many codes included on Medicare claims were believed to be "improperly used," let alone why the codes were evidence of fraud, which is obviously necessary for EpicGenetics to meaningfully rebut a suspension based on fraud allegations.

69.    The Notice's claim that the FM/a Test uses "panels to indiscriminately screen specimens" is even more mysterious. The FM/a Test does not, in fact, use any panels, and only tests for one, specific disease. Without any modicum of specificity, it is impossible for EpicGenetics to fully respond to Defendants' claims that so inaccurately describe the service provided by the Company and fail to explain why Defendants could possibly believe these claims are reliable evidence of fraud.

70.    Notwithstanding these challenges, on January 27, 2022, Plaintiff provided Defendants with a rebuttal letter addressing what it could glean from the cryptic suspension Notice. However, the lack of information in the Notice forced Plaintiff to guess at the allegations, making it impossible for Plaintiff to take full advantage of its rebuttal opportunity. CMS has recognized the importance of a provider's rebuttal opportunity, describing it as "the provider's only opportunity to present information

as to why suspension action should not be initiated or should be terminated" and noting that it requires "careful[] review."[6]

71.   Pursuant to 42 C.F.R. § 405.375 (2011), Defendants were required to issue a written response to Plaintiff's rebuttal letter within 15 days of submission. For over 2 months, Defendants refused to abide by this requirement.

72.   Defendants must also "consider the statement (including any pertinent evidence submitted), together with any material bearing on the case." 42 C.F.R. § 405.375(a) (2011). This plainly requires that Defendants consider all available information, not just the rebuttal statement. EpicGenetics asked repeatedly, in its rebuttal statement and in numerous emails and requests for phone calls with Defendants, for additional information or clarification concerning Defendants' reasons for the suspension and the information Defendants needed to determine whether to lift the suspension, but Defendants repeatedly refused to provide this information.

73.   After submitting via overnight mail its rebuttal statement on January 27, 2022, which tracking information showed that Defendant Qlarant received on January 28, 2022, EpicGenetics did not receive any confirmation of receipt. It was not until February 10, 2022 that EpicGenetics finally received this confirmation, and only after it had unilaterally contacted Qlarant requesting acknowledgement of the rebuttal statement. Qlarant did not communicate anything regarding a review or determination as to whether to terminate or continue the suspension under the applicable regulations.

74.   On February 10, 2022—13 days after the rebuttal statement was received—counsel for EpicGenetics contacted the HHS Office of General Counsel ("OGC"), requesting a call to discuss the suspension and explaining that "time is of

---

[6] Medicare Program Integrity Manual, 8.3.2.2.5., *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c08.pdf.

the essence for the survival of the company." Ex. E, at 117 (Feb. 10, 2022, Email with HHS). EpicGenetics noted that "the company is unaware of any complaints or allegations made to, or active investigation by, the government and the limited information in the Qlarant letter suggests that the allegations CMS may be considering are way off base." *Id.*

75.   HHS OGC did not accept the request for a phone discussion and forwarded the email to the Acting Deputy Director of the Division of Investigative Support at CMS's Center for Program Integrity ("Deputy Director CMS/CPI"). Ex. F, at 121 (Feb. 11, 2022, Email with HHS/CMS). That same day, the Deputy Director CMS/CPI confirmed by email that CMS had received EpicGenetics' rebuttal statement and that "[w]e are reviewing the information you provided and a response will issue as soon as possible." *Id.*

76.   Also on February 10, 2022, EpicGenetics received a letter from Defendant Qlarant requesting that EpicGenetics produce 30 sample medical records. Ex. G (Qlarant Records Request). There was no indication in the letter of how the requested medical records related to the stated grounds for the suspension; instead, the letter cited the agency's authority to "reopen" initial determinations, redeterminations, reconsiderations, decisions, and reviews—but Qlarant did not state what it was "reopening" or the specific "good cause" for doing so. *See* 42 C.F.R. §§ 405.908 (2017), 405.986 (2022). EpicGenetics contacted Qlarant to discuss the request, and a Qlarant representative stated that the request was unrelated to the suspension. EpicGenetics provided these records to Qlarant on March 16, 2022, but to date has received no response from Qlarant or CMS about these sample records, other than Qlarant's confirmation of receipt.

77.   On February 11, 2022—14 days after the rebuttal statement was received by Qlarant— counsel for EpicGenetics contacted the Deputy Director CMS/CPI, again requesting a phone call and noting it was "surprised and troubled that CMS would request this information *after* initiating a no-notice suspension." Ex. F, at 120.

If CMS believed a review of these records was necessary to determine whether a payment suspension was necessary, it easily could and should have done that *before* deciding to implement the crippling Medicare suspension. EpicGenetics urged in the email that it is the only "provider of a scientifically proven, reliable 'rule-in' test for Fibromyalgia, but if the suspension continues, it will not survive." *Id.*

78.   On February 14, 2022, Qlarant emailed EpicGenetics stating it was in receipt of the rebuttal statement and that the rebuttal "*will* be reviewed" (emphasis added). Ex. H, at 146 (Feb. 14, 2022, Email Thread). EpicGenetics immediately responded to Qlarant that the 15-day response period provided for in CMS's regulations had lapsed and reiterated that "time is of the essence for EpicGenetics and its patients." *Id.* at 146. Plaintiff yet again requested a call with Qlarant and CMS to discuss the suspension and gain additional clarity on the "vague grounds" provided in the original Notice. *Id.* Plaintiff requested that if Qlarant and CMS were not able to speak about the matter immediately, they lift the suspension pending further discussions about the purported grounds for the suspension. *Id.*

79.   On February 15, 2022, Defendant Qlarant responded simply that, "We understand your concerns. However, the rebuttal is being reviewed carefully, and a final response is forthcoming." *Id.* at 145.

80.   Upon receipt of this email, EpicGenetics again contacted HHS OGC, cc'ing the Deputy Director CMS/CPI, noting Qlarant's and CMS's refusals to provide EpicGenetics with basic information about its suspension or to provide the response to EpicGenetics rebuttal letter required by CMS's own regulations. *Id.* at 144. It also informed HHS OGC of the dire financial consequences it faced—in particular, that EpicGenetics lost 90% of its expected test volume in the months immediately following the suspension. *Id.*

81.   On February 16, 2022, HHS OGC replied, writing in an email that CMS was in receipt of the rebuttal and "will be responding to [EpicGenetics]," and to direct all inquiries to CMS's Center for Program Integrity ("CPI"). *Id.* at 143.

Gibson, Dunn &
Crutcher LLP

Plaintiff noted that it "ha[d] repeatedly asked CPI – via [the Deputy Director] . . . – for a call to discuss this matter, without any reply . . . I respectfully submit that a phone discussion is in everyone's best interests so that the company can assist CMS in evaluating the purported grounds for the suspension, and I truly do not understand why the agency would not welcome an opportunity for a dialogue or at least to receive additional information." *Id.* The Deputy Director CMS/CPI replied that "CPI's position is that a meeting is not necessary." *Id.* at 142.

82.   After another week with no response—and now 13 days beyond the deadline for the response required by CMS's regulations—EpicGenetics again contacted the Deputy Director CMS/CPI on February 25, 2022 to reiterate its concern about the lack of information about the basis for the supposed "credible allegations of fraud" and, even more urgently, the serious financial jeopardy created to the company by the suspension and accompanying loss of patient revenue. *Id.* at 141–42. EpicGenetics proceeded to detail the financial hardship it was already facing as a result of the suspension, including the continued decrease of over 90% of tests provided. EpicGenetics pleaded again for a call and for CMS to lift the suspension while "pledg[ing] its cooperation with CMS's investigation going forward." *Id.*

83.   Also on February 25, 2022, EpicGenetics separately contacted HHS OGC to express its concern that CMS was not handling the suspension in a timely manner and was driving EpicGenetics into a financial jeopardy while simultaneously ignoring the provider's pleas to engage with the agency on the matter. Ex. I (Feb. 25, 2022, Email with HHS). Three days later, HHS OGC responded simply that "CPI . . . is in the process of drafting an email response" to EpicGenetics' February 25 email to the Deputy Director CMS/CPI. *Id.* at 151.

84.   On March 1, 2022, the Director of CMS CPI's Division of Investigation Support, ("Director CMS/CPI") responded to Plaintiff's February 25, 2022 email to its Deputy Director, noting that the email had been forwarded to her. Ex. H, at 140–41. In response to EpicGenetics' explanation of its financial situation, the

Director CMS/CPI asked that EpicGenetics provide monthly statements of cash flows for the past year, monthly cash flow projections for the coming year, and tax returns. *Id.* She added, "[i]n addition, please note that 42 C.F.R. § 405.375(a) (2011) does not require a written response within 15 days. Please be assured that CMS is in compliance with its regulations." *Id.*

85.   The Director CMS/CPI's statement regarding the applicable regulation was misleading and inaccurate. The regulation at 42 C.F.R. § 405.375 (2011) plainly does require that CMS or its Medicare contractor "send written notice of [its] determination" within 15 days from the date the statement is received. *Paragraph (a)* of that provision does not "require a written response within 15 days"—it only requires that CMS "determine whether the facts justify the termination of the suspension" within 15 days. But the *very next paragraph* of the same regulation states that "[t]he Medicare contractor must send written notice of the determination *made under paragraph (a) of this section* to the provider," and that the notice must contain "specific findings on the conditions upon which the suspension is initiated, continued, or removed and an explanatory statement of the determination." *Id.* (emphasis added).

86.   The next day, EpicGenetics responded to the Director CMS/CPI's request for financial documents and asked for a call to clarify the scope of the request because, as a very small company with only 20 employees, it did not maintain the specific types of financial documents cited by the Director CMS/CPI in the ordinary course of business. Ex. H at 139–40. It urged that "[i]t is important to EpicGenetics that the company does not guess at what you would consider to be sufficient for such a showing [of financial hardship] only to learn too late that you thought it was inadequate." *Id.*

87.   In response, on March 3, 2022, the Director CMS/CPI stated: "CMS cannot provide guidance, including types of alternative information to submit.

Gibson, Dunn & Crutcher LLP

However, please be assured that we will carefully consider anything that is submitted." She added that CMS "d[id] not believe a call is necessary." *Id.* at 138.

88.  On March 14, 2022, EpicGenetics notified CMS that it had worked with its accountant to provide detailed financial documentation that would satisfy its requests. *Id.* at 137–38. The accompanying financial data it provided to CMS included monthly operating results for January 2021 through February 2022 and monthly projections of revenue and expenses through the end of 2022.

89.  CMS then shifted the goalposts, once again, to avoid providing a meaningful response to EpicGenetics' request for an end to the suspension. On March 17, 2022, CMS requested new financial information—despite the fact that EpicGenetics had pleaded for CMS to discuss with it *in advance* the information the agency would need for its consideration—claiming that "[t]he information you presented was not sufficient." *Id.* at 136–37. This approach by CMS caused yet more unnecessary delay and hardship for EpicGenetics.

90.  On March 22, 2022, EpicGenetics explained that it does not keep tax returns because it reports consolidated taxes through a parent company and those tax returns would not be helpful to CMS. *Id.* at 135–36. Nevertheless, EpicGenetics was able to provide the financial statements it prepared to support EpicGenetics' portion of the parent company's tax reporting. The financial projections and tax reporting documents together showed that even before the suspension, EpicGenetics was in significant debt with no positive retained earnings. As a result of the suspension, the Company's average monthly revenue in 2022 is expected to decrease by approximately 88% from its 2021 average, and its projected net income for fiscal year 2022 has plummeted. EpicGenetics urged once again for CMS to simply "tell us

1    what you need," noting that in light of the ongoing harm to the Company

2    "EpicGenetics cannot afford for this to continue as an iterative process."[7] *Id.* at 136.

3        91.   On March 23, 2022, CMS again asked for new information that it had not

4    previously requested, despite EpicGenetics' repeated requests for CMS to work

5    productively with the Company. This time, CMS sought information concerning any

6    "related-party transactions" included in EpicGenetics' financial statements. *Id.*

7    at 135.

8        92.   EpicGenetics responded on March 29, 2022 with an explanation of why

9    itemized related-party transaction documentation is not readily accessible, but also

10   proposed that that granular information was also not necessary in this case. *Id.*

11   at 133–34. Instead, EpicGenetics provided a detailed description, with specific

12   figures, of how the Medical Corporation and EpicGenetics divided payments of

13   EpicGenetics' expenses and how EpicGenetics submitted certain net revenue after its

14   share of expenses to the Medical Corporation. *Id.* Although EpicGenetics did not

15   have the documentation of individual transactions readily available for CMS, it

16   provided more than enough information for CMS to understand the financial

17   relationship between EpicGenetics and the Medical Corporation as "related

18   part[ies]." *Id.* EpicGenetics made clear yet again and in no uncertain terms that it

19   could not continue to survive the suspension if CMS dragged out the process with

20   such unnecessary iterative requests, especially requests that are immaterial to

21

22

23   [7] EpicGenetics received automated out-of-office messages from the Director and/or
     Deputy Director CMS/CPI overseeing the suspension on at least five occasions,
     causing further concern about CMS's ability to timely act as required by the
24   regulations. CMS and HHS made clear to EpicGenetics that email is the only
     method of communication by which they may be contacted on this matter, and they
25   have closed all other potential lines of communication. HHS and CMS do not
     publish the office numbers for the people handling the suspension or their
26   supervisors, and phone information is not included in those individuals' email
     signatures. When EpicGenetics called CMS to try to reach someone by phone, the
27   receptionist said that they could not connect EpicGenetics by phone and it would
     have to contact CMS by email. Likewise, Qlarant has not provided any individual
28   person's phone or email and instead requires that all communication go through a
     generic email address.

determining the current and prospective financial hardship to the Company caused by the suspension.

93.   On March 29, 2022, the Deputy Director CMS/CPI confirmed receipt of the additional financial information and stated simply that "[w]e will review." *Id.* at 133.

94.   In light of CMS's shifting standards, requests for information that do not bear on EpicGenetics' current financial condition, and refusals to have any discussion about the available financial documentation, EpicGenetics is forced to conclude that CMS is deliberately disregarding that the suspension is causing the Company's rapid decline into financial ruin and, by extension, harm to its employees and fibromyalgia patients.

95.   In a separate email that same day, EpicGenetics provided a pre-publication copy of a study conducted by the Mayo Clinic regarding the efficacy of the FM/a Test. Ex. J (March 29, 2022, Manuscript Email). The study concluded:

> The FM/a® test (a chemokine-cytokine multiplex assay) is a novel and useful tool for the diagnosis of FM. In the study sample of 50 participants with FM, the assay correctly identified 90% of cases.

Ex. D, at 108. Notably, the Mayo Clinic recognized that "[t]he FM/a® test is positioned as a 'rule in' study; this is in contrast to the 'rule out' paradigm that many clinical practices utilize, ordering numerous tests and sub-specialty consultations during the work-up for a possible diagnosis of [fibromyalgia]." *Id.* at 106.

96.   In other words, the Mayo Clinic independently found that the FM/a Test is effective, accurate, and saves money for Medicare beneficiaries with symptoms of fibromyalgia.

97.   Upon hearing no further response from CMS with regard to the information it requested, EpicGenetics again contacted CMS on April 4, 2022, stressing that "[t]ime is of the essence" and again asking for an opportunity to speak with CMS. Ex. H at 132–33.

98.  Four days later, on April 8, 2022, CMS finally responded. Despite EpicGenetics' prior explanation that it did not maintain many of the aforementioned documents in the ordinary course of business, its multiple attempts to offer alternative documentation, and its repeated requests for CMS to tell it what substitute documentation it could provide—and despite the Deputy Director CMS/CPI previously confirming receipt of the information without indicating it would be insufficient to respond to her request—CMS stated that it "lack[ed] the necessary data to conduct a well-grounded hardship determination." *Id.* at 132.

99.  In light of the weeks of back and forth, EpicGenetics asked CMS to explain the insufficiencies so that it could provide the desired information by close of business on April 11, 2022. *Id.* at 131–32.

100. But no response explanation was provided on April 11, 2022. On April 13, 2022, CMS again requested financial documentation that EpicGenetics had already explained it either did not keep in the regular course of business or that would take weeks of work to accumulate—weeks that EpicGenetics could not afford to endure after Defendants' repeated delays over 11 weeks—all for a process that Defendants were required to complete in 15 days. *Id.* at 130.

101. On April 8, 2022, EpicGenetics notified HHS OGC that in light of the agency's conduct EpicGenetics had no choice but to seek judicial review, and asked for a final opportunity to resolve the situation outside of litigation. HHS OGC confirmed receipt of this information on April 11, 2022, but declined to speak with EpicGenetics.

102. In response to EpicGenetics' plan to seek judicial relief, on April 20, 2022, Defendants delivered what purports to be a written notice of determination to continue the suspension as required by 42 C.F.R. § 405.375 (2011). Ex. C (April 20, 2022, Response Letter).

103. The written notice appears to be an effort by CMS to block this Court from reviewing CMS's unlawful conduct.

104. Much like the Notice of Suspension, Defendants' response fails to provide the information required by CMS's own regulations. Pursuant to 42 C.F.R. § 405.375(b) (2011), this "written notice of the determination" must contain "specific findings on the conditions upon which the suspension is initiated, continued, or removed."

105. The response contains no such "specific findings." Nothing in Defendants' written response identifies any new or different information than that provided in the original Notice of Suspension. The response letter copies and pastes, verbatim, the vague and cursory "reasons" listed in the Notice, and it does not elaborate on those reasons or name the specific findings supporting the continued suspension.

106. Importantly, nothing in Defendants' written response identifies the actual allegation of *fraud* that supposedly provided the regulatory basis for instituting the suspension. Fraud requires that a perpetrator knowingly and willfully commit a fraudulent act with intent to deceive the victim. Nothing in Defendants' written response identifies any evidentiary or other basis for believing that EpicGenetics acted "knowingly and willfully" or with an intent to deceive—or, for that matter, with any lesser culpable state of mind.

107. Despite continuing to allege that EpicGenetics used improper coding in its sample claims, Defendants' response does not identify the codes that were allegedly misbilled, the billing requirements that these codes violated, or why the coding supports an allegation of intentional fraud. This falls far short of the "specific findings" required by 42 C.F.R. § 405.375(b) (2011).

108. In response to the 3 studies that EpicGenetics provided to support the accuracy of the FM/a Test, Defendants wrote that "[w]hile EpicGenetics has provided research articles and studies that support use of the FM/A Test, subject matter experts at Qlarant are aware of guidance that disputes EpicGenetics' claims." Ex. C at 85. EpicGenetics is not itself aware of any such guidance, and Defendants

provided no information, whatsoever, about this "guidance":  no name, source, regulation, governing statute, or any identifying information. EpicGenetics cannot rebut the allegations of fraud, which Defendants claim are partially based on this "guidance," without knowing what that guidance actually is. Nor did Defendants explain how unidentified guidance disputing the utility of the FM/a Test—guidance that Defendants concede is inconsistent with other peer-reviewed research and studies conducted by top clinical researchers—could provide a basis for a determination that EpicGenetics engaged in intentional fraud.

109. Like the original Notice of Suspension, Defendants' April 20, 2022 response reiterates that EpicGenetics' services are medically unnecessary, in part, because diagnostic tests must be ordered by a treating physician and used in managing the beneficiary's condition. Defendants' response goes on to claim that "no medical records were provided to substantiate that [EpicGenetics'] example claims were medically necessary" and that it was "impossible" for them to determine whether the services met Medicare requirements without these records. *Id.* at 86–87.

110. But over the last several weeks, EpicGenetics has repeatedly asked that Defendants tell the Company what information it needs to assess the validity of these allegations. At no point did Defendants ask for additional medical records for these 5 sample claims. Qlarant's statement creates a Catch-22 for EpicGenetics, because it refused to provide enough information for EpicGenetics to know what medical records would rebut the allegations or otherwise be useful to CMS.

111. Moreover, in an allegedly unrelated inquiry, Qlarant *did* request the medical records of 30 patient claims, which EpicGenetics provided on March 16, 2022. It defies all logic that the entity clearly able to request and review medical records—records that EpicGenetics can and did provide—would now claim that it cannot make a determination of medical necessity because it did not ask for and does not possess the medical records of these 5 specific individuals.

Gibson, Dunn & Crutcher LLP

112. EpicGenetics pleaded with Defendants, for months, to identify the information it needed and provide a written determination, only for Defendants to finally provide a response—clearly in direct response to EpicGenetics notifying HHS of its intent to pursue legal action—that offers no new information or findings and chastises EpicGenetics for failing to provide records that Defendants never requested to rebut allegations Defendants refused to explain.

113. CMS's response letter asserts that it "will consider any additional information and/or evidence EpicGenetics may submit," but that assertion is flatly contradicted by Defendants' evasive tactics thus far. *Id.* at 89. Instead, the response letter appears to be yet another effort by CMS to move the goalposts, circumvent CMS regulations, the Due Process Clause, and the requirements of the Administrative Procedure Act, and drag out this process knowing it will bring EpicGenetics to financial ruin and cause harm to its employees and patients.

114. These actions leave EpicGenetics to conclude that Defendants' motive in their April 20, 2022 response was not to explain the suspension and comply with its regulatory obligations, but rather to prevent EpicGenetics from seeking the relief to which it is entitled in this Court.

115. Should Defendants be allowed to continue with their procedural and constitutional violations, EpicGenetics would, in theory, be forced to wait until an investigation is complete and an overpayment determination is made to bring rebuttal evidence before an adjudicating body, despite the fact that EpicGenetics could provide such evidence now.

116. Without intervention from this Court, EpicGenetics will continue to suffer unsustainable losses and will likely go out of business before it can fully pursue an administrative appeal of an overpayment determination. At that point, any retroactive determinations in EpicGenetics' favor could not resurrect a business that no longer exists.

117. Moreover, as the only provider of a rule-in test to diagnose fibromyalgia, EpicGenetics' patients will also suffer and be left with no other affirmative testing options to diagnose fibromyalgia, thereby demonstrating irreparable harm entitling EpicGenetics to preliminary and permanent injunctive relief.

118. If this Court does not issue injunctive relief, EpicGenetics and its patients will have no review at all before irreparable harm takes place, and, thereafter, the theoretically available administrative remedies will no longer exist.

119. EpicGenetics has no other avenue to stay the suspension of Medicare payments or address Defendants' refusals to abide by the law. If Defendants are not enjoined, Plaintiff will suffer immediate and irreparable harm long before it has an opportunity to even begin the administrative appeals process. Such harm includes the shuttering of its business, the loss of good will and business reputation, the inability to provide fibromyalgia diagnostic services to patients nationwide, and the interruption or cessation of ongoing research into the first cure for fibromyalgia.

120. Even if EpicGenetics could afford to stay afloat until the investigation is complete, the appeals process would not provide EpicGenetics a chance to address the validity of the suspension Notice itself or Defendants' repeated violations of due process, which are causing immediate and irreparable harm. An appeal would resolve only the merits of a final overpayment determination, essentially allowing Defendants to completely evade review and accountability for their refusals to abide by Medicare regulations, the Due Process Clause, and other applicable law.

121. But in reality, EpicGenetics will not be able to survive beyond June 30, 2022 with continued suspension of Medicare payments. Up to 40% of its revenue in 2021 was derived from Medicare services, and monthly testing revenues have already decreased by more than 90%.

122. The revenue derived from non-Medicare services is typically generated through advertising, which required significant expenditures by EpicGenetics each

Gibson, Dunn & Crutcher LLP

month. The suspension forced EpicGenetics to choose between paying for advertising or paying its highly-specialized staff—EpicGenetics chose the latter.

123. Even still, EpicGenetics has already had to lay off 7 of its 20 employees and decreased the hours of many others, in conjunction with virtually eliminating all discretionary spending. As a small company providing a single specialized service, EpicGenetics cannot afford to weather the continued suspension of payments without due process and will be forced to close its doors within approximately 2 months, if not sooner.

124. In sum, there is a high risk that EpicGenetics will be erroneously deprived of its interest in Medicare payments it has earned for services provided because, among other things: 1) Defendants failed to provide the information necessary for EpicGenetics to meaningfully exercise its right to a rebuttal; 2) Defendants failed to abide by the required timeline of 15 days to respond to the rebuttal that EpicGenetics provided; 3) Defendants failed to provide the requisite "specific findings" to support the continued suspension in its written response on April 20, 2022; and 4) EpicGenetics' business will cease to exist within approximately 2 months, effectively preventing it from exhausting administrative remedies to challenge the payment suspension or Defendants' violations of the Medicare Act and Due Process Clause. As such, no administrative or judicial review is otherwise available to contest Defendants' *ultra vires* actions.

## CLAIMS FOR RELIEF

## COUNT ONE

### Procedural Due Process

125. The allegations contained in paragraphs 1 through 124 of this Complaint are incorporated by reference as if fully set out here.

126. EpicGenetics' Medicare payments, its legitimate expectations for receipt of Medicare payments for services provided to fibromyalgia patients, and its interest in continuing its one-of-a-kind, ground breaking business, constitute valuable

property and liberty rights and interests within the meaning and protection of the Due Process Clause of the Fifth Amendment to the United States Constitution.

127. Defendants have deprived EpicGenetics of these interests without due process of law in violation of the Fifth Amendment of the United States Constitution and other applicable law.

128. To the extent the current framework under which Defendants can suspend Medicare payments indefinitely, without prior notice, does not include the minimum procedures required by the Due Process Clause, that regulatory framework is unconstitutional.

129. Even if the regulatory framework satisfies the bare minimum due process protections required by the Constitution, it only does so insofar as Defendants actually abide by those protections, which they have failed to do here.

130. The Due Process Clause also forbids agencies from withholding or unreasonably delaying action that they are required to take.

131. Defendants seek to impose a lengthy and indeterminate suspension of EpicGenetics' Medicare payments—which will likely force it out of business—without any meaningful procedural protections.

132. Defendants are required by CMS regulations to provide EpicGenetics with an opportunity to rebut the allegations of fraud, which inherently requires that Defendants provide enough information such that EpicGenetics knows what it is meant to rebut. Defendants have refused to do so, rendering the rebuttal opportunity an "opportunity" in name only.

133. The regulations also required Defendants to respond to a rebuttal letter within 15 days of submission after considering all relevant information. Instead, EpicGenetics' requests for a written response or opportunity to meet with Defendants were repeatedly denied, ignored, or met with "out of office" messages, and no written determination was issued until April 20, 2022.

Gibson, Dunn &
Crutcher LLP

134. Furthermore, the regulations required that Defendants' written response contain "specific findings" to support their decision to continue the suspension of payments. The response contained no such specific findings and did not identify any actions or intent supporting an allegation of fraud.

135. EpicGenetics is therefore entitled to relief, including an order prohibiting Defendants from continuing the suspension of payments until Defendants have completed their investigation or, alternatively, complied with the Due Process Clause.

## COUNT TWO

**Defendants' Failure to Comply With CMS Regulations is *Ultra Vires*, Arbitrary and Capricious, Contrary to Law, and Without Observance of Procedure Required by Law**

136. The allegations contained in paragraphs 1 through 124 of this Complaint are incorporated by reference as if fully set out here.

137. Defendants were required by regulation to provide EpicGenetics with a meaningful opportunity for rebuttal and a response within 15 days that named specific findings to support a continued suspension.

138. Defendants have indefinitely suspended all of EpicGenetics' Medicare payments even though they refuse to provide EpicGenetics with enough information for it to submit a rebuttal and provided a written response 67 days after the initial 15-day period had passed. Moreover, that response contained no specific findings to support the continued suspension and did not identify any actions or intent supporting an allegation of fraud.

139. In so doing, Defendants have failed to comply with the Medicare regulations. Under these circumstances, it would be a clear abuse of discretion, arbitrary and capricious, contrary to law, and without observance of the procedure required by law for Defendants to continue the suspension of Medicare payments prior to the conclusion of its investigation. *See* 5 U.S.C. § 706(2).

Gibson, Dunn &
Crutcher LLP

140. EpicGenetics is therefore entitled to relief under the Medicare Act, the APA, and other applicable law.

141. As the only provider of the sole, affirmative diagnostic test for fibromyalgia, Defendants' decision to suspend EpicGenetics' Medicare payments, knowing it will force the Company to close its business, blatantly jeopardizes the health and safety of fibromyalgia sufferers nationwide, and the government's own spending of health program funds on "rule-out" tests and treatments for alternative potential conditions, in an irreparable way.

142. Under these circumstances, Defendants lack any non-arbitrary basis for a finding that good cause does not exist.

143. The Court should enjoin Defendants from engaging in such *ultra vires* actions, which contradict the legal rules limiting Defendants' authority and nullify EpicGenetics' only opportunity to address the reason for the suspension that could end its business.

## COUNT THREE

### Defendants Have Unlawfully Withheld or Unreasonably Delayed Actions Required Under Applicable Laws

144. The allegations contained in paragraphs 1 through 124 of this Complaint are incorporated by reference as if fully set out herein.

145. The Due Process Clause forbids agencies from withholding or unreasonably delaying action that they are required to take.

146. The APA forbids agencies from withholding or unreasonably delaying action that they are required to take. *See, e.g.*, 5 U.S.C. §§ 555(b), 706(1).

147. Defendants are required by regulation to provide EpicGenetics with a meaningful opportunity for rebuttal. To take advantage of this opportunity requires that Defendants provide enough information for EpicGenetics to know what it must rebut.

148. Defendants were required by regulation to respond to a rebuttal letter within 15 days of submission after considering all relevant information.

149. EpicGenetics submitted its rebuttal statement to Defendants on January 27, 2022 and has made repeated attempts to provide Defendants with additional information.

150. Over two months later, Defendants have still failed to provide the requisite level of information for EpicGenetics to take advantage of its rebuttal opportunity.

151. In doing so, Defendants have failed to comply with the Due Process Clause, the APA, and Medicare regulations.

## COUNT FOUR

### Writ of Mandamus

152. The allegations contained in paragraphs 1 through 124 of this Complaint are incorporated by reference as if fully set out herein.

153. In the alternative, the granting of a Writ of Mandamus is warranted to compel Defendants to abide by their clear, nondiscretionary duties to provide Plaintiff with sufficient information such that it can submit a meaningful rebuttal, consider all evidence that bears on EpicGenetics' case, and make a new written, detailed determination within 15 days of the rebuttal as required by 42 C.F.R. § 405.375 (2011).

154. If the Court concludes that it lacks authority to provide relief under Counts One through Three, then Plaintiff has no adequate remedy other than mandamus to cure Defendants' unlawful actions before those actions force Plaintiff out of business.

## PRAYER

155. For these reasons, Plaintiff respectfully asks for the following:

      a.   That the Court issue preliminary and permanent injunctive, as well as declaratory, relief prohibiting Defendants' temporary suspension

of Medicare payments until Defendants complete their investigation of the purported allegations or comply with the basic requirements of due process;

b. That the Court vacate and set aside the temporary suspension of Plaintiff's Medicare payments;

c. That the Court declare that Defendants' actions violate the Due Process Clause, the APA, and the Medicare Act;

d. That the Court compel Defendants to provide Plaintiff with adequate information concerning the fraud allegations underlying the suspension within 7 days of the Court's order, allow Plaintiff to submit a supplemental rebuttal based on that information, and respond within 15 days of any additional rebuttal, and in the event Defendants do not lift the suspension, allow Plaintiff an opportunity for prompt review by a neutral decisionmaker such as an administrative law judge.

e. That the Court grant Plaintiff's petition for a Writ of Mandamus and require Defendants to:

 i. Provide, within 7 days of the Court's order, detailed information concerning the "credible allegations of fraud" to permit a supplemental rebuttal by EpicGenetics, including information about both the substance of the allegations and the "indicia of reliability" that allowed CMS to determine the allegations were "credible"; and

 ii. Provide, within 15 days of any additional rebuttal by EpicGenetics in response to the new information, a detailed written response to EpicGenetics' rebuttal either confirming termination of the suspension or explaining in detail any decision to continue the suspension.

iii.  In the event Defendants do not lift the suspension, allow Plaintiff an opportunity for prompt review by a neutral decisionmaker such as an administrative law judge.

f.  That the Court enter judgment in Plaintiff's favor;

g.  That the Court award Plaintiff its reasonable costs, including attorney fees, incurred in bringing this action under 28 U.S.C. § 2412 or other applicable law; and

h.  That the Court issue and award Plaintiff such other and further relief as the Court deems just and proper.

Dated:  April 25, 2022

DOUGLAS FUCHS
GIBSON, DUNN & CRUTCHER LLP


By:  /s/ Douglas Fuchs
              Douglas Fuchs

Attorney for Plaintiff EpicGenetics LLC

Gibson, Dunn &
Crutcher LLP

38